**Joseph MARTIN & Margaret Martin, h/w**

v.

**MUNICIPAL PUBLICATIONS t/a Philadelphia Magazine.**

**Civ. A. No. 79–3940.**

United States District Court, E. D. Pennsylvania.

March 31, 1981.

Doris J. Dabrowski, Ronald I. Rosen, Philadelphia, Pa., for plaintiffs.

David H. Marion, Kohn, Savett, Marion & Graf, Philadelphia, Pa., for defendant.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

In its January 1, 1979 issue defendant *Philadelphia Magazine* published a photograph of plaintiff Joseph Martin wearing his Mummer's costume.[1] The photograph bore the following caption:

Dead animal of the month

A New Year's tribute here to all the ostriches who gave their tails to make the world free for closet transvestites from South Philly to get themselves stinking drunk. Have a nice year.

Mr. Martin has brought this diversity action, alleging that by this publication defendant has libeled him, invaded his privacy by placing him in a false light and intentionally inflicted upon him severe emotional distress. In addition, the other plaintiff, Mrs. Margaret Martin, sues for the loss of her husband's services, society and companionship, allegedly the result of the distress Mr. Martin suffered by the publication of his picture in that manner by defendant. *Philadelphia Magazine* has moved for summary judgment. For the reasons that follow, I will deny the motion.

## THE LIBEL CLAIM

Count II of the complaint alleges that defendant has libeled plaintiff Joseph Martin by publishing his photograph in the manner previously described. Determination of the merits of a defamation action under Pennsylvania law involves two inquiries: (1) has the defendant harmed the reputation of plaintiff within the meaning of state law and (2) if so, does the First Amendment preclude recovery nonetheless.[2] *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 270 (3d Cir. 1980). Resolution of the first question, whether or not the plaintiff's reputation has been harmed, also involves a two step inquiry. Under Pennsylvania law, the court first must decide if the challenged communication is capable of a defamatory meaning; that is, does the communication "tend so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with him."[3] *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971). If the court so finds, it is the task of the jury or factfinder to determine if recipients of the communication have understood it to be defamatory. *Id.*

The first argument made by *Philadelphia Magazine* in support of its request for summary judgment on the libel claim is that the photograph of Mr. Martin and the accompanying statement are incapable of a defamatory meaning. Defendant asserts that "it is abundantly clear that the publication was not intended to be understood in a literal sense" and "was plainly a spoof,

---

1. Apparently, this photograph was taken on January 1, 1978, when plaintiff marched in the Philadelphia Mummers Parade as a member of the Hegeman String Band. It is undisputed that defendant did not have plaintiff's permission to publish the picture.

2. The parties seem to agree that the law to be applied in this diversity action is that of Pennsylvania. Given Pennsylvania's interest in this litigation (the alleged defamation was published here), I see no reason to disturb the parties' choice of law. *Jones & Laughlin Steel v. Johns-Manville Sales*, 626 F.2d 280, 284 (3d Cir. 1980).

3. This definition is the same as the one found in Section 559 in both the First and Second Restatement of Torts.

satire, and nothing more." (p. 3, defendant's reply memorandum).

■ I do not share defendant's view of the publication in question. The caption appearing beneath Mr. Martin's picture includes the statement, "A New Year's tribute here to all the ostriches who gave their tails to make the world free for closet transvestites from South Philly to get themselves stinking drunk." Such a description is clearly derogatory and would tend to lower the person described in the estimation of the community or deter others from associating with him. Further, that description, appearing as it does below a photograph of plaintiff in a Mummer's costume, reasonably could be interpreted as referring specifically to plaintiff as well as generally to all Mummers.[4] Since the picture and caption appeared in the "FLASH" section of the magazine, known to readers as potpourri of light humor, satire and parody, defendant urges that no reasonable person would interpret it to be a serious statement. The problem with this argument is that people who were not familiar with the magazine and the nature of the "FLASH" section may have seen this publication of Mr. Martin's photograph. Defendant may be able to convince a jury that the publication was so obviously humorous that no person seeing it would have taken it as defamatory, but I am not persuaded that as a matter of law the challenged publication is incapable of defamatory meaning.

■ *Philadelphia Magazine* further argues that even if the publication were capable of a defamatory meaning, the First Amendment precludes recovery in this case as plaintiff, in his capacity as a Mummer, is a "public figure." Under *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny, in order to recover a plaintiff who is a "public figure" must show that the defamatory material in question was published by the defendant with knowledge of or reckless disregard of its falsity. However, for at least two reasons, defendant is not entitled to summary judgment on this basis.

First, Martin is not a "public figure" as defined by the *New York Times v. Sullivan* line of cases. In *Gertz v. Robert Welch, Inc.*, the Supreme Court described a public figure as follows:

Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974)

It is clear that Mr. Martin, as one of some 15,000 Mummers, does not possess the requisite fame and notoriety to qualify as a public figure for all purposes. Also, there is no evidence that he has thrust himself to the forefront of any controversy which would justify treating him as a public figure for some limited purpose.

■ Moreover, even if I were to find that Mr. Martin is a public figure, the defendant would not be entitled to summary judgment on this point. Once it has been determined that a plaintiff bringing a defamation action is a public figure within the *New York Times v. Sullivan* standard, in order to prevail that plaintiff must show that the defendant published false material knowing of its falsity or with reckless disregard of the truth. In the instant case, as the record now stands, it is not clear that plaintiffs

---

4. Although Mummers come from all parts of Philadelphia, as an institution the Mummers are associated with South Philadelphia. Therefore, many Philadelphians reading the challenged publication would interpret the reference to South Philly as a reference to the Mummers.

could not prove such knowledge of falsity or reckless disregard of the truth on the part of *Philadelphia Magazine*. In its briefs filed in support of the motion, defendant repeatedly states that at the time of publication of Mr. Martin's photograph in its "FLASH" section *Philadelphia Magazine* had no basis to believe that he was a closet transvestite who got stinking drunk.[5] Therefore, defendant apparently concedes not only that the information included in the caption below Mr. Martin's picture was not accurate but also that the magazine was aware of this inaccuracy prior to publication. I find accordingly that *Philadelphia Magazine* has failed to show that it is entitled to summary judgment on Count II, plaintiff's libel claim.

## THE FALSE LIGHT INVASION OF PRIVACY CLAIM

In Count I of the complaint, plaintiff Joseph Martin alleges that the defendant, by publishing the photograph and caption discussed previously, invaded his privacy by portraying him "before the public in a false light in a manner offensive to reasonable persons." (¶ 14 of the complaint) Under Pennsylvania law, four different torts are encompassed under the rubric of invasion of privacy: (1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life, and (4) publicity placing a person in a false light. *Vogel v. W.T. Grant Co.*, 458 Pa. 124, 327 A.2d 133, 136 (1974).[6] An action for "false light" invasion of privacy is concerned with protecting the interest of the individual in not being made to appear in a light or position which is both objectionable and false. Comment b to § 652E of the Restatement (Second) of Torts. In order to prove such a claim under Section 652E, which is followed by Pennsylvania courts, a

plaintiff must show that the false light in which he has been placed would be highly offensive to a reasonable person and that the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which it placed the plaintiff.

It is Mr. Martin's claim that defendant's publication of his photograph accompanied by the caption already described portrayed him falsely as a closet transvestite and a drunk. The defendant magazine maintains, however, that since no reasonable person could so interpret the challenged publication, it is entitled to summary judgment on this count.

While *Philadelphia Magazine* asserts that as in a defamation case it is for the court to determine in a "false light" tort action whether the disputed communication is capable of bearing the meaning claimed by plaintiff, I believe that the question of whether a message would be highly offensive to a reasonable person is a matter for the jury. *See, e. g. Uhl v. CBS, Inc.*, 476 F.Supp. 1134, 1139 (W.D.Pa.1979). However, regardless of which of these two theories is applied, defendant is not entitled to summary judgment. For the same reasons that I rejected defendant's claim that the caption appearing below Mr. Martin's picture is not capable of a defamatory meaning, I now must reject the argument that no reasonable person would find the statement in question highly offensive. It seems clear that there are reasonable people in this community who would find the remark about closet transvestites who like to get stinking drunk to be highly offensive. As I cannot find that the defendant is entitled as a matter of law to summary judgment on this count, the question of whether a reasonable person would find the statement highly offensive will be decided by a jury.[7]

---

5. In its reply memorandum filed in support of the motion for summary judgment, defendant wrote:

    Defendant had no reasonable grounds for believing the publication to be true *or false* because the statement in the caption clearly was not meant to be taken at face value. (p. 10)

6. Pennsylvania law follows the Restatement (Second) of Torts (1965) on the invasion of privacy, §§ 652A–E.

7. Defendant's reliance on *Neff v. Time, Inc.*, 406 F.Supp. 858 (W.D.Pa.1976) is misplaced as this case is clearly distinguishable. First, the

## THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

In Count III of the complaint, plaintiff Joseph Martin alleges that by publishing his photograph with the caption referring to closet transvestites who get stinking drunk, defendant *Philadelphia Magazine* has caused him severe emotional distress. Asserting that no reasonable person could find this publication to be egregious and outrageous, defendant has moved for summary judgment on this claim. Given the facts of this case, however, I believe the issue of whether defendant's conduct was sufficiently extreme and outrageous must be decided by the jury.

Pennsylvania law recognizes the tort of intentional infliction of emotional distress as defined in Section 46 of the Restatement (Second) of Torts (1965) and its interpretative comments. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273–74 (3d Cir. 1979). Section 46 provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Thus, this tort involves four elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. The Third Circuit has stated that it is for the court to determine whether a reasonable person could find defendant's conduct to be extreme and outrageous. If there is sufficient evidence to support such a finding, the matter must go to the jury for it to find the facts and make its own characterization. *Chuy, supra,* at 1274.

I find that there is sufficient evidence now of record from which a jury reasonably could find that the publishing of plaintiff's photograph without his permission with a caption which states "Dead animal of the month: A New Year's tribute here to all ostriches who gave their tails to make the world free for closet transvestites from South Philly to get themselves stinking drunk" constitutes extreme and outrageous conduct.[8] Therefore, I must deny defendant's summary judgment on Count III.

## MRS. MARTIN'S CLAIM

In Count IV of the complaint, Joseph Martin's wife, Margaret Martin, has alleged that as a result of her husband's distress about the disputed publication she has suffered the loss of his services, society and companionship. Defendant's sole argument in support of summary judgment on this count is that since the claim is derivative of her husband's claims and his claims are without merit, hers must also fall. As I have found that *Philadelphia Magazine* is not entitled to summary judgment on the claims alleged by Mr. Martin, this argument is not persuasive. At trial, should Mr. Martin be able to convince a jury that as a result of defendant's conduct he has suffered emotional and psychological distress, Mrs. Martin also may be able to establish that she is entitled to recover for the loss of his services, society and companionship. Accordingly, I will deny summary judgment on Mrs. Martin's claim.

An appropriate order accompanies this memorandum.

---

plaintiff in that case sued for appropriation of his name or likeness and publicity given to private life. Defendant had published a photograph of plaintiff which showed him with the zipper of his trousers open; the picture was one of three included on an article about fans of the Pittsburgh Steelers. The Court granted summary judgment in favor of the defendant, finding that the picture had been taken with plaintiff's knowledge that it might well appear in a magazine article. Unlike the matter now before me, the challenged photograph in the *Neff* case did not include an arguably objectionable caption.

**8.** In *Chuy, supra,* the Third Circuit upheld a jury's finding in favor of plaintiff on an intentional infliction of emotional distress claim where a team physician told a member of the press that one of the players on the team had a potentially fatal disease even though the doctor knew the player did not have the condition. One could certainly argue that the conduct complained of here is equally as extreme and outrageous.